May I please the court? My name is Haifam Bouloud and I represent Miguel Angel Silva-Pimentel and I would be referring to him as Miguel, your honors. Appreciate the fact that you continue to all these hearings despite the pandemic. It's imperative, your honors, to know what we're asking for today. In this appeal we're only asking that you grant him, we're not asking that you grant him asylum, we're not asking we grant him withholding or any applications. We're just asking that the judge gives him the chance to apply for such relief. May I begin by asking whether there, I understood you to be appealing only on the CAD issue, is that correct or not correct? Our brief mostly covers that issue, we do refer to him having tattoos and possibly being persecuted because of that. You don't make any argument at all about the particular social group or nexus or anything. It is true, we did not do that. If I took the position that those issues are not in the case, would I be correct? Yes, your honor. So you're just going forward on your client's entitlement to a hearing or an application for CAD, is that right? Yes, your honors. All right. And that's all we're asking the judge to give us, a chance to proceed based on the CAD application. We have plenty of evidence to show that he was tortured by the police in Mexico. Just a brief background, recall that Miguel came to the U.S. at six or eight years old. He lived here 12 years and was deported and came back. Obviously his prior deportation order was reinstated and he goes before a judge, the asylum officer reviews, talks to him, takes statements from him and the immigration judge reviews that decision by the asylum officer. Did not take any testimony, did not ask any questions of Miguel, just relied on the asylum officer's report. Can I ask, because we rarely see these, whether that is the usual way these proceed or not, do you know? Let's see, in my experience, your honor, what should I say? We could go both ways. You can, the judge had, I mean he was on video before him, the judge can ask any questions he wants. He had, he was, it wasn't my, I wasn't representing him, but his lawyer was present, but the judge can choose either to take testimony, ask any questions or not. So frankly, I just had one two days ago where the judge actually asked certain questions of my client. In this case, it did not happen. And remember, the standard is very low. We're just asking, the judge has to determine whether there is a reasonable possibility, which is more likely than not, that a grant of the actual application will be granted. It's essential to know too that the asylum officer found Miguel to be credible. Immigration judge did not disturb that. So whatever Miguel said is true based on the precedents in this court and because there's nothing to dispute that he was not telling the truth or he was not credible. So we all know what torture is. I just want to go through some of the acts that happened with your honors. The torture that happened, well, let's back up for a second. How do you determine whether there is a reasonable possibility that torture happened? It's a two-step analysis. First, the- Well, wait a minute. Is it a reasonable possibility that torture happened or a reasonable possibility that he would be able to demonstrate that it's more likely than not that torture happened? I don't, as I say, the standard is odd. Well, the reasonable possibility that, I see. The reasonable possibility that he will be tortured if he returns to Mexico. Does that make it any clearer? Is that more likely than not? Because if it is, it is the same as a substantive standard, but I didn't think it was the same as a substantive standard. No, it's a lesser standard and more likely than not, your honor. That's what reasonable possibility- You said the opposite before. Okay. No, I didn't mean to say the opposite. It is a lesser standard than the more likely than not. And that process is a two-step analysis. First, you have to determine whether past harm amounted to torture. The IJ, in this case, completely skipped this part and just concluded that Miguel will not be tortured in the future. That's why remand is necessary here. The IJ completely ignored the police and gangs which harmed Miguel in the span of a few years in multiple cities in Mexico. If I may, just I'll go briefly through them. Everywhere Miguel went, he was a target. In Puerto Vallarta, five policemen beat him up, stomping on his face with their boots and hitting the sides of his body. Also in that city, organized criminals tried to run him over and later beat his head and stomach with rifles, which caused him to vomit. Blood. Men in camouflage came to his house, put a bucket on his head and kidnapped him for three days and threatened to kill him if he did not work with them. And when he refused to work for them, they looked him up, kidnapped him again at gunpoint, and he ran away from them at that time. A car rammed his motorcycle, knocking him off. The car reversed in an attempt to kill him. His housemate was kidnapped, returned naked with burns on his body, Your Honors. In another city, police handcuffed him, threw him in a car and put their feet on his back. And the police stopped him many times and detained him for no reasons. In the city of Puebla, a man pulled the trigger with his gun pointed at his head. Luckily, the gun jammed. The man beat him up anyway on the head. And the interesting point here, Your Honor, is that when he ran away from this man, the police was right there. He tried to get their help. They just ignored him. This is why all of this points that a reasonable possibility exists for him, that he will be tortured in the future if returned to Mexico. I would like to reserve a couple of minutes for the end. Thank you. Mr. Bialik, can I ask you one question? Hopefully it's quick. Is it significant at all that when he was asked whether anybody who's harmed in the past would be interested in harming him now, or at that point it was seven years later, he said he didn't know? Does that make his claims of fear of future persecution speculative? Or in your view, is it just not relevant? I gotta share with you something that's in the record, but we haven't talked about this. Miguel, at two years old, fell from very high and fell on his head. His girlfriend, the mother of his children, testified in one of the letters she wrote that really his memory is very limited. You could ask him to bring two things, he'd bring just one to you. So in that sense, in my view, his testimony that he doesn't know and some of the answers really don't jive with the fact that I just don't know how his memory functions, frankly. So if he says, I don't know, I'm just not sure whether he doesn't really know or he just doesn't remember who would harm him. Okay, you may reserve your time. Ms. Fischer. Good afternoon. My name is Kate Fischer and I'm representing the government. So I was going to lead with the testimony from the petitioner's credible fear interview that the judge just identified, which is, do you think the people who harmed you before will want to harm you now? He says, to tell you the truth, I don't know. Is that standard? Does that matter? We seem to have lost judgment. Um, Christian, could you stop the clock, please? Judge, this is Sam. I'm working on reconnecting her at the moment. So Judge Christian, are we all okay now? Yes, thank you. So Judge Berzon, an answer to your question, does it matter? I think it does because it bears, of course, on the likelihood of future harm that he might encounter. My question was, because frankly, I don't remember. Your question was, I quoted the testimony that Judge Fodd had identified, which is, to tell you the truth, when he was asked, do you think the people who harmed you before will want to harm you now? I thought what I saw was that in looking at prevention against torture in particular, we look at whether he is likely to encounter torture from somebody in the future, not necessarily the same people. Is that right? If you're referring to the line of cases like Nauru and Aidu, and their analysis of past torture, is that where you're directing me? Oh, I'm talking about future. Right, right. The future harm, he has to establish that it's likely. And certainly, it doesn't help him when he's asked, do you think the people who harmed you before will want to harm you now? And he says, to tell you the truth, I don't know. And that brings us to- I hope he took that to mean the same people, but not police in general. Right, but he has to have some basis. Otherwise, it's just pure wild speculation. But it's not wild speculation, counsel. This is a pretty extraordinary record. There's some people who are civilians, I'll say, and look like they're members of the drug cartel. But in terms of running into the police in three different communities, it's a pretty well-established track record. But he- well, that's how he's portraying it. But the way the IJ looked at it, it was a series of random encounters. And when he was asked specifically whether or not he thought that he had had these problems because of his tattoos, he said, I think so. But then he was asked, did anyone ever say anything about your tattoos? And he said, no. Right, but whatever it is, whether it's the tattoos, and it is 100 tattoos, so one would think there's a reason he's getting called out. But it is a remarkable pattern, whatever it is that's calling him to their attention. Well, it might be, Your Honor. But I think the way the IJ saw it, which is certainly reasonable, is that it suggests generalized evidence of violence and crime in Mexico. And he may have found himself in the wrong place at the wrong time several times. And that doesn't have any bearing on whether or not in the future- I'm sorry, Judge Berzon, I couldn't quite understand- I thought that one of his incidents was that he was, somebody pulled a gun on him, and a police officer was there and didn't do anything. Well, I think, I didn't focus on that. It might go to acquiescence. But it doesn't, I don't think, suggest the likelihood, or bear on whether the likelihood of whether it might happen again. And- For private people, it also happened a bunch of times. And then we have a question of acquiescence with regard to the private people. And the one time there was a police officer nearby, he stood there and didn't do anything. So we have, and again, we're at a lower standard. We're not at a more likely than not standard at this point. We're at a reasonable likelihood standard. I understand, Your Honor. But if you look at the testimony, his credible fear interview, his reasonable fear interview, it's just, it's extremely amorphous, whether he's lost his memory or whether he doesn't really know who's going to harm him, but he has a bad sense. Whatever it is, there's nothing to actually hang your hat on and say, there's a likelihood of future torture. And I think that's probably what alerted the IJ and disturbed him and made him think that this is a description of random general crime. And also random general crime is one thing to the extent that some of these incidents involve him hanging out with his friend who's associated with a drug cartel, which sounds like that's part of it. But on the other three, we have in Puerto Vallarta, in Puebla, in Acapulco, he's moving, trying to, and every place he seems to go, he's having these encounters with the police. That's petitioner's argument, Your Honor. And I understand that he regards it as a coincidence. I'm not sure in Mexico if this would be a coincidence or not. And I'm not sure that it really bears on whether or not he would face that type of problem in the future. It was attributed, or at least the IJ attributed it to false accusations of crime. And in one instance, it was homelessness. And he didn't, it wasn't as though he testified, this is the situation I'm going to be in. And this is why I'm scared of torture in the future. Instead, what he said, it's weird over there. It's like a jungle. And that, if that, if that suggests a torture claim, then we're really opening that up. Let me just take one more step at this, if we can. And if you could take a step back, what we've got, though, it seems to me, is this protracted pattern. And then we have, as was noted a minute ago in response to Judge Berzon, a case law that requires, you know, we start by looking at what has happened in the past. And it seems to me we have, even though we went to three different communities, some distance, a significant distance apart, he has this very consistent pattern. Is there anywhere he went where he didn't have this happen? I don't think so. I think, Your Honor, that what he would need to have testified in order for it to suggest a likelihood of future torture is that it's a pattern. It's specifically attributable to a character trait or something about him, which he didn't testify to. And that that's like what makes it likely to assume that it's going to happen in the future. That's not what his testimony adds up to. And I'm not sure why, but he certainly didn't say, if he had gone in there and said, I have been harassed and harmed physically and tortured by the police in these various situations. And here's the reason why. It's because I have these visible tattoos. And if I go back, that's what's going to happen to me in the future. But that's just not what his testimony added up to. Well, there was some... The NYJ found that his encounters with the police was not due to the tattoos. We don't know that. All we know is that he thinks they were due to his tattoos. It's fairly, you know, not unreasonable to be aware that it was due to the tattoos, but the police didn't say anything. That's all I can say from that point on. I understand, Your Honor. I think that what the NYJ was troubled about is that his testimony on this point is weak. If you said you had a problem because of your tattoos, and his answer was, I think so. It just doesn't... Can I ask you a question about the standard? So there was some discussion of that in your opposing counsel's presentation. So under the reg and the reasonable fear determination before the IJ, he has to show a reasonable possibility of future torture, but he's likely tortured in the future. But when we're reviewing the IJ's determination, are we applying substantial evidence? Yes, that's what the... I think, Your Honor, we... the government has in the past argued that it shouldn't be substantial evidence, that it should be more favorable to us, but we lost that in the Andrade case. So I think that is the standard of review, that is the way you should look at it. I'm sorry, I know what the reg is. Isn't it 1208.31a? That's the one I'm looking at. CFR 1208. Yes, and then it works with 241.8b, which is the exception where they... what happens if he... if the IJ... if he... if there is a reasonable fear, it's referred to the IJ for full consideration. And Judge Berzon's absolutely right. It's just... it's unusual. I haven't had a case like this, where you get a negative fear determination and then the IJ confirms it... affirms it. So as I was looking through the information that Mr. Silva-Pintel submitted, it occurred... it seemed to me that you have to parse through them incident by incident, rather than trying to lump them together as all of these things together necessarily establish either past torture or the likelihood of future torture. And the IJ made determinations that certain things just weren't past torture. And even if you didn't have past torture, I suppose with country reports and other information, you could show very egregious human rights violations, you could show a significant likelihood of... a reasonable likelihood of torture in the future. So, I mean, we can go through... we don't have a lot of time to do that, but, you know, there are instances where the police thought he was a robber, where he was falsely accused of touching his friend's girlfriend. And then one instance where the police robbed him. And then... so, I mean, these are... as the IJ said, these were random things that happened that don't... would not necessarily lead you to believe that in the future he's going to be mistaken for a robber, or he's going to be falsely accused of doing something, or that a police officer is going to rob him. So, I mean, there's more in there, but, I mean, if we go... I mean, is that what we have to do, is go through each of these? I think that's right. That's essentially what the IJ did. Let me just say, yes, I think Aguiar Ramos says that he could theoretically make out a claim based on the country condition evidence, but the fact is that he would then... he would need to be able to say, it can't just be generally terrible human rights violations, it has to be human rights violations that he's going to be more... that suggests that he would be targeted because of some attribute that he articulated. It has to be a picture of what is reasonable fear. Exactly. So, this man has 100 tattoos, and we have this evidence he's found to be credible. In Puerto Vallarta, a group of five police officers stamp him. They decide that he's committed some crime. They wind up stomping on his face with their boots and hitting him with rifles on the sides. He goes to Puerto Vallarta. They take his money and basically rob him because he's homeless. In Acapulco, the police officer beat me, take him to jail. They tell him this is not a place for him, threaten him to go away. And then as Judge Berzon mentioned, there's another incident where a random person comes to him for no apparent reason, except he happens to have 100 tattoos on his face. They point a gun at his head, pulls the trigger. He calls to police to try to get help, and they ignore me. So, my problem is we have this series of episodes, which you know very well, counsel, and I'm sorry to take you through them, but they are in three different locations. Why would we think anything different is going to happen? That's the problem I've got. He's got this track record every place he goes. Why would we suspect under our case law that anything different is going to happen in the future? I understand, Judge, and with all respect, I don't think that he established with his testimony that the tattoos were the reason that these things happened. And you just, you said yourself, he was homeless. So, it might have been the fact that he was homeless, or it might have been the fact that he had a tattoo. He doesn't need a protected ground. If we're just talking, Kathy doesn't need a protected ground. He doesn't need a protected ground. Right. So, something is calling his attention to these, the police take his attention, and this is what has happened, right? You're right. He does not need a protected ground. And I think it was Judge Berzon and Cole that said, if you're tortured, you're tortured. It doesn't matter why you're tortured. He still has to prove, however, that there's a likelihood that he, as an individual, is going to face a greater likelihood of torture than just anyone. And so, my question is, if you can go right to that point, why would we assume that anything is going to change in the future? What's your best answer to that question, please? I think my best answer to that, Judge, is that I'm not sure that the law allows you to assume that the same thing is going to happen without him articulating a basis for why it happened, and why he fears what may happen in the future. He articulated a basis. He said, that's what I think. And then he said, well, did anybody say that? He said, no, but he did articulate a basis, and it's not a bad guess. He said that with respect to the person who tried to shoot him and hit him with something in the head. And then he ran off and encountered a police officer, and then he says the police didn't help him, which was an acquiescence problem. It's a private individual, and the police have to know in advance and not intervene. He ran off and sought help from a police officer. This is after the fact. I guess, and I think this is maybe something the panel can talk about in conference, that the problem is we're just mixing all of these different events together as one big event, and they weren't. He was beaten in, he says he was beaten in Puerto Vallarta because they thought he was a robber. So does that mean in the future he's going to be tortured because he's going to be mistaken as somebody who has committed a crime? He says he was beaten because his friend falsely accused him of touching his girlfriend, and that happened in Acapulco. That's the only thing that happened to him in Acapulco. That's it. That's Acapulco. Falsely accused of doing something. So does that mean he'll be tortured in the future because he'll be falsely accused again in the future? So I mean, I think we're just going to have to parse through them event by event. We have the issue teed up, and we will talk about it. So Ms. Fisher, your time is way over. Thank you very much. Thank you, Judge. Yeah, and I will be very brief, Your Honors. Nothing different is going to happen if he returns to Mexico. I appreciate the fact that you read through it, you understood those facts. Nothing different is going to happen. Homelessness, since when homelessness is an invitation to be tortured? I don't understand. But does that mean that adds a particularized threat of torture to him? If there's widespread police abuse of the homeless, how is that a particularized threat of torture to your client? Unless it arises to a human rights violation where we could have evidence of country reports, et cetera, that would establish that. But he has not talked about other homeless people being tortured. He's talked about only his experience, and nowhere in the record says other homeless have been tortured. I don't see it anywhere in his file. If the IJ had any questions, Your Honor, why didn't he ask him? He was right there. Can you articulate quickly, because I do want to finish the argument, a basis on which the past events demonstrate some reasonable possibility that he will be tortured in the future? Well, he's been to three places, and in three different places, Your Honors, the police actually hurt him physically. He was arrested, he was beaten, he was mistaken for a police, told him, you're going to go 15 years to jail, and then ended up being released. So there is a pattern of the police doing this in three different locations. What makes us feel that he's going to, in the fourth location, is going to be any different? And remember, when the actor is the police, we don't care about acquiescence. And I appreciate, Judge, you mentioned that he ran out to the police, and you may see acquiescence here. I see it as well. But we don't even have to get there. The police himself or themselves beat him up. The police stomped on his face. So acquiescence is nice when you don't have those facts, but we have better facts than that. And I just don't see how that is going to be different if he goes back. And when the police is the actor, you got to assume it's going to happen nationwide. There's no safe place. Thank you so much. Thank you very much. In Silver Pimento v. Wilkinson, we'll go to Hueso C. Diaz v. Wilkinson.
judges: Berzon, Christen, Bade